# Benner *v.* Philadelphia & Reading Railway Company, Appellant.

*Negligence—Railroads—Crossing accident—Stop, look and listen —Obstructed view—Contributory negligence.*

1. A traveler on a highway who fails to stop, look and listen before reaching a railroad track is guilty of contributory negligence which will prevent a recovery for his death caused by being struck by a train, although he stopped upon one of the side tracks before reaching the main track.

2. It is an absolute and unbending rule that a traveler upon the public highway must stop, look and listen at a point before he crosses any tracks. If he has done this and then proceeds, the question whether or not he has exercised proper care in crossing the railroad as he proceeds and whether it is necessary for him to stop again, is a question for the jury. If, however, he fails to stop, look and listen before he goes on any track, he is thereby convicted of negligence, and no matter what may be the other circumstances, he cannot recover.

3. A traveler in a vehicle is not relieved of his duty to stop, look and listen before attempting to cross a railroad track because his view of the track is obstructed; under such circumstances it is his duty to alight and to walk to a point where he can make a proper observation.

Mr. Justice Simpson and Mr. Justice Stewart dissent.

Argued July 16, 1918. Appeal, No. 208, Jan. T., 1917, by defendant, from judgment of C. P. No. 4, Philadelphia Co., June T., 1915, No. 4723, on verdict for plaintiff in case of Lettie May Benner v. Philadelphia & Reading Ry. Co. Before Brown, C. J., Stewart, Moschzisker, Frazer, Walling, Simpson and Fox, JJ. Reversed.

Trespass to recover damages for death to plaintiff's husband. Before Carr, J.

The facts appear in the opinion of the Supreme Court.

Verdict for plaintiff for $13,500 and judgment thereon. Defendant appealed.

*Errors assigned* were answers to points and in dismissing defendant's motion for judgment non obstante veredicto.

*William Clarke Mason,* for appellant.

*George Demming,* for appellee.

OPINION BY MR. JUSTICE FOX, October 7, 1918:

This suit was brought by the plaintiff to recover damages for the death of her husband, who was killed at a grade crossing of the defendant company at Linfield, Montgomery County, Pennsylvania, on the first day of May, 1915. At the time of the accident Howard S. Benner, the husband of the appellee, was driving across the tracks of the railroad company in a one-horse buggy about half-past five in the afternoon.

The public road over this crossing is forty-eight feet wide, and is an old, well-defined road. Just before the public road crosses the railroad tracks, at the right-hand approaching the crossing from the east, there is a spur or side-track leading from the freight station, which ends at the road with a bumper. At the time of the accident two or more box cars were standing close to the bumper, and this, with the freight house and freight shed, obscured the view at that point in the direction from which the train approached. The public highway crosses over five tracks. The first track is another siding, which is known as the Cold Storage Company siding, and runs in front of the station and down to the plant of the Cold Storage Company. The next track is the slow speed, northbound track. The third track is the fast speed, northbound track. The fourth track is the fast speed, southbound track. The fifth track is the slow speed, southbound track. At the time of the accident, according to the testimony, there were several box cars also on the cold storage siding; but the witnesses differ as to the precise location of these cars and the extent of the obstruction of the view.

John I. Riegel, a civil engineer called by the plaintiff, testifies, from accurate measurements, as to the conditions existing at the point of crossing. He says that in addition to the box cars which were on the cold storage siding there was some obstruction of the view by reason of the station and its baywindow, the telegraph office, and a tree in front of the telegraph office, as well as some other buildings. The testimony of Mr. Riegel is that if there were no cars on the cold storage siding a view of the tracks to the south can first be obtained at a point sixteen and one-half feet from the first rail of the cold storage siding, and that a train on the northbound, slow track could be seen six hundred and fifty feet away from the center of the crossing, and five hundred and fifty feet away on the northbound, fast track, on which the train which caused the accident was approaching.

If, therefore, Benner had stopped at a point sixteen and one-half feet from the first track he would have had some view of the track on which the train approached. The fact that his view was impeded by cars on the cold storage siding did not relieve him from the obligation to stop. It imposed a further duty to proceed with due care; but stopping in the first instance was absolutely essential.

Two witnesses were produced by the plaintiff, who saw the accident and the action of Benner as he approached the crossing. One, John Seeler, an intending passenger, was waiting on the station platform, on the southern end. This witness says that Benner drove up to the first track or siding, and that at a point actually on the tracks, with the horse's front feet between the first track and the slow, northbound track, he stopped for a few seconds. The top of the buggy was up. The witness could not tell just what Benner did after he drove on the track. After stopping for a few seconds he drove on at a slow walk; immediately after he started a fast express train came around the curve, and Benner was struck and killed.

The other witness, James Boyle, was coming from the direction opposite to Benner, and was about ninety feet from the first track on the other side of the railway, facing Benner. He saw Benner drive up on the track and stop, lean forward, look first to the south and then to the north, and, after a few seconds' pause, start to drive towards the witness. The testimony of both these witnesses concurs as to what actually happened. Neither of the witnesses heard any signal given by the train, nor did they hear the noise of the train until the engineer blew several short whistles, indicating the emergency that had arisen.

It is perfectly clear, therefore, from the testimony offered by the plaintiff that Benner did not stop, look and listen before he crossed any of the tracks. It is true that he stopped on the tracks, but that is not a compliance with the rule.

The learned judge of the court below submitted the case to the jury and entered judgment on the verdict, assigning as a reason therefor that as the accident did not happen on the cold storage siding the failure of Benner to stop before he entered on this track was not negligence. He further held that the question of whether or not he was negligent, as he was injured on one of the other tracks, under all the circumstances was to be submitted to the jury and determined by them. This is not the law. It is an absolute and unbending rule that a traveler upon the public highway must stop, look and listen at a point before he crosses any tracks. If he has done this and then proceeds, the question whether or not he has exercised proper care in crossing the railroad as he proceeds and whether it is necessary for him to stop again is a question for the jury. But if he fails to stop, look and listen before he goes on any track he is thereby convicted of negligence, and, no matter what the other circumstances, he cannot recover.

In Ihrig *v.* Erie Railroad Company, 210 Pa. 98, it is said: "It is argued that the rule that a traveler before

crossing the tracks of a steam railroad must stop, look and listen for the approach of a train is not a fixed rule to be observed under all circumstances but only a reasonable requirement, the nonobservance of which, while prima facie evidence of negligence, may be explained and excused. That this proposition cannot be sustained under the decisions is clear. There is no break nor wavering in the line of cases extending back nearly forty years, which hold that the rule is inflexible and admits of no exceptions and that a failure to observe it is not merely evidence of negligence but is negligence per se. There has been no clearer statement of the rule than that made by the present Chief Justice in Aiken v. Penna. R. R. Co., 130 Pa. 380: 'It is not a rule of evidence but a rule of law, peremptory, absolute and unbending; and the jury can never be permitted to ignore it, to evade it, or to pare it away by distinctions and exceptions.' "

What the appellee asks us to do in the present case is to make an exception of this case and to say that because Benner was not injured on the first track his failure to stop before crossing it did not produce the accident. This is bending the rule which has been declared to be unbending. No one can say that if he had stopped at a point before crossing the first track a sufficient length of time to make proper observation he would not have discovered the approach of the train, or if he had stopped and proceeded would have reached the scene of the accident soon enough to collide with the train that killed him. The fact that the first track was a siding did not relieve Benner from the obligation of the rule. This is clearly pointed out by the late Mr. Justice POTTER in Peoples v. Penna. R. R. Co., 251 Pa. 275.

It is further argued that Benner was relieved from the obligation to stop because of the obstructions which prevented his view before crossing the cold storage siding, but if this be true, another duty was imposed upon him.

It was his duty to alight and go to a point where he could make a proper observation.

"Where a driver stops at a point where an obstruction prevents a proper view of the railroad he is about to cross, he must descend from his vehicle, and, if necessary, walk to a point where the prospect is clear": Siever v. Pittsburgh, C., C. & St. L. R. R. Co., 252 Pa. 1; Earl v. Philadelphia & Reading Railway Co., 248 Pa. 193; Mankewicz v. Lehigh Valley R. R. Co., 214 Pa. 386; Kinter v. Penna. R. R. Co., 204 Pa. 497.

We therefore hold that the plaintiff's case develops such evidence of negligence on the part of Benner, the decedent, that, notwithstanding the alleged negligence of the railway company, there can be no recovery.

The fifth, sixth and eighth assignments of error are sustained, and the judgment is reversed.


DISSENTING OPINION BY MR. JUSTICE SIMPSON, October 7, 1918:

The verdict and judgment below were for the plaintiff. This court now proposes to enter judgment for the defendant non obstante veredicto. In considering whether or not such a judgment ought to be entered, of course every fact and inference of fact, favorable to plaintiff, which a jury might find to be true, must be conclusively accepted as true; and every allegation of fact, unfavorable to plaintiff, which a jury might reject, must be rejected. Viewed in this light, and leaving out of consideration for the present the presumption of law hereinafter considered, the relevant facts of the case are as follows:

At Linfield, Montgomery County, Pennsylvania, a public road crosses the railroad tracks of the defendant company. At the time of the accident no safety gates, automatic bells, flagmen, or other devices were there to warn those about to cross the tracks. There were six tracks running approximately north and south. Looking from east to west, the first was a siding, which

did not cross the road. The second was also a siding, which ran to a near-by private cold storage plant. The other four were the regular railroad tracks, upon which defendant transported passengers and freight to distant points. The second of these four tracks was the fast northbound passenger track. Not far to the south of the crossing the tracks curved to the west, and were soon lost to view. At the distance of 1,254 feet south, was a whistle-board, opposite which it was the duty of defendant's engineers traveling northwardly to give warning of the approach of their trains, to those about to cross the tracks at said public road. At the time of the accident there were freight cars upon both sidings, not then being moved, and so placed by defendant as, with buildings, trees, etc., to render it impossible, for those traveling on the road towards the west, to see up and down the four regular tracks, at any place until a point on or beyond the cold storage siding was reached. The southward view from that point was about five hundred feet; and the distance from that point to the nearest rail of the fast northbound passenger track was about twenty feet. The space between the tracks was seven feet four inches, and between the two rails of the same track, four feet eight and one-half inches. At the time of the accident there was a strong wind blowing from the north, tending to render obscure, if not prevent, the hearing of sounds from the south.

At that time plaintiff's husband was driving westwardly on said road. He was alone in a buggy. The distance from the nose of the horse to the buggy was approximately nine to ten feet. No witness saw him stop before he reached and was on or partly over the cold storage siding. Some witnesses say he did not stop before then, some that he did not stop at all, but one said he might have so stopped, but the witness did not see it. His supposed failure to stop before reaching the cold storage siding, constitutes the contributory negligence alleged against him. When he reached

the point on or partly over the cold storage siding, which was the first point where, as above stated, he could in fact see up and down the tracks, he stopped, looked and listened, but, seeing and hearing nothing, drove forward, and was struck and killed by an express train on the fast northbound passenger track. No whistle was blown or bell rung at the whistle-board or thereafter, or any warning given until the train was about 150 feet from the crossing, when, according to the engineer, he "opened the whistle, gave an awful shriek and applied the emergency brakes," scaring the horse, (which was then upon the fast northbound passenger tracks,) causing it to rear and plunge without going forward. He also says the train was traveling at the rate of 59 miles an hour. It struck the horse and buggy midway, throwing the horse to the westward 100 feet north of the crossing, and entirely clear of the tracks; and deceased to the eastward 132 feet north of the crossing into a ditch between the two sidings. When the train itself was stopped, its last coach was 450 feet north of the crossing.

Under the above facts it is admitted that the case was for the jury on the question of defendant's negligence; but it is contended, and the opinion of the majority of the court decides, that deceased's failure to stop before crossing the cold storage siding, constituted conclusive evidence of his contributory negligence.

I cannot concur in that conclusion. In effect it holds that a man may be adjudged guilty of contributory negligence, and the defendant who has injured him relieved of all liability, although in fact he was guilty of no negligence which contributed to his injury. The utmost point to which the majority opinion is willing to go, is in the statement that "no one can say that, if he had stopped at a point before crossing the first track [thereby meaning the cold storage siding] a sufficient length of time to make proper observation, he would not have discovered the approach of the train, or, if he had stopped and proceeded, would have reached the scene of the

accident soon enough to collide with the train that killed
him." But if "no one can say" whether or not he was
guilty of contributory negligence, the law can and does
say that he was not; for "he who avers a fact in excuse
of his own misfeasance must prove it": Beatty v. Gil-
more, 16 Pa. 463; Coolbroth v. Penna. R. R. Co., 209
Pa. 433.

Inasmuch, therefore, as admittedly there was suffi-
cient evidence from which the jury could and did find
the defendant guilty of negligence, the syllogism is
complete: (a) Defendant was guilty of negligence
in killing plaintiff's husband; (b) Unless plain-
tiff's husband was guilty of contributory negligence,
plaintiff can recover for defendant's negligence; (c)
Plaintiff's husband was not guilty of contributory negli-
gence, for the reason that "no one can say" that he was.
Hence plaintiff can recover.

Notwithstanding this logical conclusion, the majority
opinion says she cannot recover because, as alleged,
her husband did not "stop" before crossing the cold
storage siding, as he was bound to do, in compliance with
the "absolute and unbending rule that a traveler upon
the public highway must stop, look and listen before he
crosses any tracks." If this case was within the reason
and spirit of that rule, which was adopted by this court
more than half a century ago, and has been adhered to
steadfastly ever since, then must we apply it here, how-
ever much we may doubt the propriety of a court (whose
only duty is to decide as to the legal rights and liabilities
of the particular litigants before it) foreclosing the
rights of future unheard litigants, by an arbitrary rule,
without legislative action, when in the nature of things
the rights of those future litigants may be materially
different, owing to the varying facts. Since that rule
was first adopted and published, the members of thirty-
one legislatures and one constitutional convention have
been elected, met and adjourned, leaving it still in force,
and because thereof, despite doubts as to the wisdom of

making it arbitrary, stare decisis compels our adherence to it now, however much plaintiff may suffer by reason thereof. In these later days when our people have been learning anew to respect the rights and liberties of others, and thereby to preserve their own, we ought not to extend that rule beyond its reason and spirit, to the injury of any one. In the interests of justice the courts are swift to confine acts of assembly within their reason and spirit. A fortiori should they do so with their own arbitrary and unbending rules, lest those selected to administer justice may be the means of wholly defeating it.

Moreover, the purpose of adopting this rule as a fixed and arbitrary one, and of now enforcing it, is that our people may know that they and those dependent upon them will alone be the sufferers if they do not give heed to it, thereby building up the habit of obedience to its requirements. But to extend it as now proposed would not aid in accomplishing this purpose, for it would run counter to the habits and customs of our people, and a rule which does that would not in practice obtain even a passing currency. He little knows our American people who imagines that they will obey a rule which uselessly attempts to delay them in the ends they seek to accomplish. Tell them they must not cross a siding wherever cars are, or are soon liable, to be shifted, and they will understand and recognize that they should obey it. But tell them that they must not do so though there is no motive power on the siding with which to move the cars, and they will neither understand nor obey. Over a siding, in the condition the cold storage siding was at the time of this accident, even the proverbial tortise could have passed in safety. Every one who then saw the siding knew that was so; and every one, even all those who adopted and those who enforce the rule of "stop, look and listen," in all human probability would have acted just as plaintiff's husband did. To say then that plaintiff cannot recover because

it is alleged that her husband did not do a useless thing, which no one else ever does, is to punish her, though both she and her husband were innocent, and benefit no one but the defendant, which, the jury has found, did her a most grievous wrong.

The opinion of the majority, after saying that the deceased should have stopped before entering upon the cold storage siding, asserts that if he has done so, and then proceeds, "the question whether or not he has exercised proper care in crossing the railroad as he proceeds and whether it is necessary for him to stop again is a question for the jury." That is, the majority opinion concludes that if he had stopped where he could have seen nothing, the question would have been one for the jury, even though he did not stop between the siding and the main tracks, where alone he could see before entering upon the dangerous part of the crossing. To justify that conclusion the majority opinion says that if he "had stopped at a point sixteen and one-half feet from the first track [the cold storage siding] he would have had some view of the track on which the train approached," overlooking the fact that the witness relied on for that conclusion had said, as indeed quoted in the majority opinion itself, that this would have been so only "if there were no cars on the cold storage siding," where in fact there were then such cars; and overlooking also, as testified to by three witnesses, that no view could be obtained anywhere short of the cold storage siding. Moreover, instead of the law being as stated in that excerpt, the precise reverse is true, for it has been repeatedly held that it is negligence per se to stop only at a point where you cannot see: Ely v. Pittsburgh, C., C. & St. L. Ry., 158 Pa. 233, 237; Mankewicz v. Lehigh Valley R. R., 214 Pa. 386; Bistider v. Lehigh Valley R. R., 224 Pa. 615.

There are not less than three answers to the allegation of conclusive contributory negligence in this case:

1st. Plaintiff's decedent was killed, and from that fact arises a presumption that he did "stop, look and listen,"

at the right place, and continued to perform his duty throughout; and that presumption alone is sufficient to carry the case to the jury, even though there be strong evidence to the contrary: Penna. R. R. Co. v. Weber, 76 Pa. 157; Penna. R. R. Co. v. Weiss, 87 Pa. 447; Blauvelt v. Delaware, L. & W. R. R. Co., 206 Pa. 141; Patterson v. Pittsburgh, C., C. & St. L. R. R. Co., 210 Pa. 47; Hugo v. Baltimore & Ohio R. R. Co., 238 Pa. 594.

In Pennsylvania R. R. Co. v. Weiss, supra, it is said: "The presumption of a fact in law, which carries a case to a jury, necessarily leaves them in possession of the case. True, the evidence to rebut the presumption may be very strong, yet it is a matter for the jury and not for the court. The force of the evidence may or may not be sufficient to convince them that the natural presumption arising from human instinct is repelled. But before they can come to this conclusion they must consider the circumstances under which the repelling witnesses testify. They may be such as not to convince a rational mind that the deceased heedlessly rushed into danger, or the character of the witnesses and their appearance before the jury may render them unworthy of belief, consequently the jury only can determine the fact put in issue by the presumption of law."

It is true that if plaintiff's case had itself overthrown the presumption, the court would have been bound to decide according to the fact thus proved, but such testimony must be "clear and indisputable"; and it may be said here, as was said in Unger v. Philadelphia, B. & W. R. R. Co., 217 Pa. 106, 109: "The plaintiff's case rested upon the presumption of care, unrebutted by proof that would have warranted the court in holding that it was overcome, and upon testimony tending to show negligence on the part of the defendant. It was clearly for the jury."

2d. Had deceased stopped at the point suggested in the majority opinion he could have seen nothing. Three witnesses so testified. But, assuming the contrary, the

distance he could have seen was 500 feet. The train was
traveling at the rate of 59 miles an hour, and to cover
the 500 feet would have required less than six seconds.
The point where the majority opinion suggests that he
might have stopped, was 16½ feet east of the east rail
of the cold storage siding. If he had had a flying start
and driven his horse at a speed of five miles an hour, it
would have required over 6½ seconds to have traversed
the distance to the point where he was struck, and dur-
ing all that time, until too late to avoid the accident, he
would have had no view of the oncoming train.

When he approached the crossing he had the choice
of not stopping at all, which from ample evidence the
jury found was not what he did; or of stopping where
the majority opinion says he might have stopped, and
where, as three witnesses testified, he could have seen
nothing if he did; or of stopping at the point where it
is alleged he first did stop, and where for the first time he
had a view of the tracks. This was on or partly over the
cold storage siding. If it be that he took the risk of an
injury from a train on that siding, the answer is he re-
ceived no such injury, and that act in no way contributed
to the injury he did receive. If he had stopped, where
the majority opinion says he should have stopped, or at
any point short of the cold storage siding, in view of the
fact that he could see nothing, the only thing he could
have done would have been to tie his horse or get some
one to hold it,—for he would have been guilty of negli-
gence had he left it unfastened and unattended on the
public highway,—alight from his buggy, and go forward,
risking the imaginary danger of the cold storage sid-
ing, and stop, look and listen at the very place he actual-
ly did, then return, untie the horse, enter the buggy,
and drive over the same ground he had walked over, and
then beyond and across the tracks. Thus to do would
have occupied at least three times that required for
a train, traveling as this one was, to reach the point

where he was killed, even though it was at the furthest visible distance away when he started back.

Obviously, therefore, the only reasonable and sensible thing to do, was exactly what he did. Neither in this class of cases, nor any other, does the law require of a man that he do a vain and useless thing, and so we said in Bard v. Philadelphia & Reading Ry. Co., 199 Pa. 94, 99. Or, as was said in Barthelmas v. L. S. & M. S. Ry. Co., 225 Pa. 597, 601: "The rule which imposes on the traveler the duty of stopping, looking and listening before entering on a crossing, implies antecedently that there is a safe place where he may stop, and by the exercise of his senses of seeing and hearing, inform himself as to the situation with respect to safety." In this case deceased did stop at the very first place where he could see and hear, and yet the opinion of the majority condemns him because he did not do that which, by the verdict of the jury, founded on the testimony of three witnesses, and by mathematical demonstrations, would have been a vain and useless thing even if done.

3d. Moreover, the opinion of the majority is in direct antagonism to the reason and spirit of the rule itself. It will hardly be contended that a failure to stop, look and listen would relieve a negligent defendant from liability, if, for instance, plaintiff would have gotten safely across but for a defect in the crossing itself. At any rate, we held in Baughman v. Shenango & Allegheny R. R. Co., 92 Pa. 335, that such a contention is of no avail. What then is the reason for the rule? In North Penna. R. R. Co. v. Heileman, 49 Pa. 60, 64, it is said that the reason is "because movement upon such a road is more speedy, and the consequences of a collision are usually so disastrous." As those disastrous consequences are the result of the rapid movement, it follows that the reason of the rule is the necessary rapidity of railroad travel. It is for that very reason that we have not required those crossing trolley tracks to stop before so doing, despite the very high speed with which the trolleys run: Carson v.

Federal St. & P. V. Ry. Co., 147 Pa. 219; Callahan v. Philadelphia Traction Co., 184 Pa. 425; Haas v. Chester St. Ry. Co., 202 Pa. 145.

But the like reason exists in regard to sidings leading only to private plants. Trains move slowly thereover, much slower than the trolley cars on their tracks; and the movement of cars on such sidings is much less frequent than those on trolley tracks. Consequently, a no more stringent rule should be applied, and no case suggests otherwise unless it be Peoples v. Penna. R. R., 251 Pa. 275, cited in the opinion of the majority. If that case applied a more stringent rule, I would be in favor of so modifying it as to conform to reasonable requirements. But it does not do so. There the plaintiff was injured on the siding itself, which was "in frequent and daily use by the railroad company." Had he looked he would have seen that the cars on that siding were then being shifted, but he did not, and his automobile was struck "immediately upon its getting upon the railroad track." In the present case there was no injury upon the siding. That was crossed in safety, as it was plainly to be seen it could be; and stopping on it, in order to look and listen, was the only safe and sensible thing to do before attempting to cross the dangerous main tracks.

Perhaps the case in our reports, which is most nearly like the present, is Gray v. Penna. R. R., 172 Pa. 383. There, as here, there was a siding and main track, the former occupied by freight cars which obstructed a view of the latter until the former was passed. Deceased "stopped on the side track at the end of the freight cars," and was killed while crossing the main track. We permitted a recovery by plaintiff.

In my judgment this case, upon the evidence, was for the jury, and for that reason I dissent from the judgment of the majority.

Mr. Justice STEWART joins in this dissent.